**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | |
|---|---|
| MARY L. GIBSON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | NO. 2:11-CV-412 |
| ) | |
| INTERSTATE BLOOD BANK ) | |
| ADP-UCS BIO-BLOOD ) | |
| COMPONENT, INC., ) | |
| ) | |
| Defendant. ) | |

<u>**OPINION AND ORDER**</u>

This matter is before the Court on Defendant's Motion for Summary Judgment, filed on January 3, 2014. For the reasons set forth below, this motion is **GRANTED**. Because no claims remain pending, this case is **DISMISSED** and the Clerk is **ORDERED** to enter judgment in favor of Defendant and close this case.

<u>BACKGROUND</u>

On November 9, 2011, Plaintiffs, Mary L. Gibson and Nefertiti Beacham, brought suit against their former employer, Defendant, Interstate Blood Bank ADP-UCS Bio-Blood Component, Inc. ("BBC"). Plaintiffs allege that they were terminated on the basis of their race, in violation of Title VII of the Civil Rights Act. Plaintiffs also allege they were terminated in retaliation for

filing workers' compensation claims.  Further, Plaintiffs assert
that they were defamed by statements BBC made to the Gary Police
Department.  Gibson additionally brings a claim for intentional
infliction of emotional distress.

On January 3, 2014, BBC filed the instant motion for summary
judgment, arguing there are no genuine disputes and that it is
entitled to a judgment as a matter of law on every claim.
Plaintiffs, represented by counsel, have failed to respond to the
instant motion.

DISCUSSION

Summary judgment standard

Summary judgment must be granted when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  FED. R. CIV. P. 56(a).  A genuine
dispute of material fact exists when "the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Not
every dispute between the parties makes summary judgment
inappropriate; "[o]nly disputes over facts that might affect the
outcome of the suit under the governing law will properly preclude
the entry of summary judgment."  *Id.*  In determining whether
summary judgment is appropriate, the deciding court must construe
all facts in the light most favorable to the non-moving party and

draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)).

A party opposing a properly supported summary judgment motion may not rely on allegations or denials in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the non-moving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). While a non-moving party's failure to respond to summary judgment does not automatically result in judgment for the movant, a court may deem the facts in the moving party's statement of uncontested facts as admitted to the extent the facts are supported by evidence in the record. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012).

Facts

BBC is a subsidiary of The Interstate Companies and operates a plasma center in Gary, Indiana. (Tab C, Hancock Aff. ¶ 1). The

plasma center receives blood plasma from individual donors, processes the plasma, and supplies it to the therapeutic and diagnostic industries. Plaintiff Mary Gibson is African American and was employed by BBC as a training coordinator at the Gary center from November 2007 to April 7, 2011. (Tab A, Gibson Dep. pp. 11-12, 137-38). Plaintiff Nefertiti Beacham is African American and was employed by BBC as a phlebotomist and plasma processor at the Gary center from October 2008 to February 17, 2011. (Tab B, Beacham Dep. pp. 11, 52, 102; Tab C, Hancock Aff. ¶ 30).

BBC's Gary, Indiana plasma center consists of two adjacent buildings separated by a parking lot: a donor center and an administrative building with offices. (Tab A, Gibson Dep. p. 14). As a plasma center, BBC must comply with rules and regulations promulgated by the State of Indiana, the Food and Drug Administration, the Occupational Safety and Health Administration, the Plasma Protein Therapeutic Association, as well as the standards and regulations required by customers who purchase plasma from BBC. (Tab C, Hancock Aff. ¶ 4). The contracts BBC enters into with the customers who purchase plasma also give the customers the right to audit BBC's practices and procedures on a regular basis, often yearly. One consequence of a customer observing too many violations during an audit is that the customer can refuse to accept plasma from the plasma center. (Tab B, Beacham Dep. p. 101; Tab C, Hancock Aff. ¶ 6).

In 2011, BBC employed approximately 34 employees in its Gary, Indiana location. Of those 34 employees, 18 were black or African American. Currently, BBC employs approximately 30 employees, 16 are black or African American. (Tab C, Hancock Aff. ¶ 7). Jane Hancock is a Caucasian female and Regional Manager for The Interstate Companies. In this capacity she is responsible for the Gary center. (Tab A, Gibson Dep. p. 42; Tab C, Hancock Aff. ¶ 2). Hancock was responsible for the hiring of both Gibson and Beacham. (Tab B, Beacham Dep. p. 13; Tab A, Gibson Dep. p. 12). Hancock was the final decision maker for the termination of both Gibson and Beacham. (Tab C, Hancock Aff. ¶¶ 28, 40). During Beacham's and Gibson's employment, Tammy Dunkerley was the Gary center manager and she reported to Hancock. (Tab A, Gibson Dep. p. 43; Tab C, Hancock Aff. ¶ 11).

Jane Hancock made the decision to hire Mary Gibson as a training coordinator in November of 2007. (Tab A, Gibson Dep. pp. 11-12). The training coordinator is responsible for performing and/or coordinating the training of plasma center personnel and monitoring the effectiveness of that training. (Tab A, Gibson Dep. pp. 38-39; Tab A, Gibson Dep. Ex. 1, Job Description). The training coordinator position was created in 2007 and Gibson was the first training coordinator at the Gary center. Since it was a new role, Hancock gave Gibson leeway while she adjusted to the expectations of the role. (Tab C, Hancock Aff. ¶ 10). Gibson's

duties included but were not limited to training new employees at the Gary center on safety, good manufacturing practices, which included maintaining compliance with OSHA regulations, retraining employees who were found to be out of compliance or who committed errors and accidents, and training employees on BBC's standard operating procedures. (Tab A, Gibson Dep. pp. 24-30, 38-39; Tab A, Gibson Dep. Ex. 1). As part of her training duties, Gibson was responsible for monitoring and reviewing the employee training files. (Tab A, Gibson Dep. pp. 38-39; Tab A, Gibson Dep. Ex. 1). These files, also referred to as training binders, are to contain every audit and assessment that an employee has taken since the beginning of their employment. (Tab A, Gibson Dep. pp. 56- 57). These records show what employee trainings had been completed, by whom, and who monitored the completion of the training. (Tab A, Gibson Dep. p. 72). Training binders may be evaluated during customer audits and audits by government agencies to establish that BBC is in compliance with applicable regulations or customer requirements. (Tab A, Gibson Dep. pp. 57-58). BBC also had certain employees serve as training monitors to ensure the trainings and retraining at the Gary center were performed when the training coordinator was not available. (Tab A, Gibson Dep. p. 63; Tab C, Hancock Aff. ¶ 12). Hancock and Dunkerley oversaw Gibson's performance at the Gary center on a day-to-day basis, but Gibson's position ultimately reported to the Regional Training Manager who

at times was not housed in the Gary center. (Tab C, Hancock Aff. ¶ 13; Tab A, Gibson Dep. p. 47).

From the beginning of Gibson's employment in November 2007 until August 2009, the Regional Training Manager was Mary McClendon. Shelly Heckert took over as the Regional Training Manager in August 2009. (Tab C, Hancock Aff. ¶¶ 14, 21; Tab A, Gibson Dep. pp. 45-48, 52-53, 105). In October 2008, BBC placed Gibson on a development plan. The development plan was issued because Gibson was not progressing in her training role as quickly as BBC expected she would. The plan required Gibson to study processes, become more knowledgeable about standard operating procedures, correct problems with training at the center, and develop training monitors. (Tab C, Hancock Aff. ¶ 15; Ex. 1 to Hancock Aff., Gibson Development Plan).

In April 2009, McClendon visited the Gary facility. McClendon noted a variety of areas where Gibson needed improvement. This included but was not limited to: including correct dates in the training files, completing training records, bringing employees with overdue assessments up to date, planning RAD training sessions, correctly filing forms and ensuring completed documentation is placed in the binders. She provided Gibson with notes on changes to make to improve the management of her training program and files. (Tab C, Hancock Aff. ¶ 16).

In June 2009, Gibson attended a training session in Memphis,

Tennessee. Training coordinators from several centers attended the training. (Tab A, Gibson Dep. p. 61). The purpose of the training was to teach the trainers how to work with employees of different types and levels. (Tab C, Hancock Aff. ¶ 17). The training program in Memphis also covered how to conduct trainings in large groups and included simulations of how to conduct certain trainings. (Tab A, Gibson Dep. p. 73-74). The training was facilitated by the Regulatory Affairs Director for Interstate Blood Bank, Ginger Maine. (Tab A, Gibson Dep. p. 62).

In June 2009, after returning from the Memphis training, Gibson called a meeting of the managers of the Gary center. This included Diana Benevente, Carlos Peña, Diana Ruiz and Tammy Dunkerley. (Tab A, Gibson Dep. p. 76-77). The meeting was intended to be training on a new Regulatory Affairs Directive ("RAD"). At the end of the training, Gibson told the management team she would be scheduling another meeting and requested that the managers come to the next meeting prepared to discuss both good and bad qualities of the other members of the management team. (Tab A, Gibson Dep. pp. 76-79). Gibson had not previously discussed having this second meeting with Hancock. (Tab C, Hancock Aff. ¶ 19).

Shortly after the initial meeting with the managers about the RAD, Hancock found a document in her printer stating Gibson's plans to meet again with the management team to discuss what Gibson described as a problem of "non-communication" plaguing the

managers. (Tab A, Gibson Dep. pp. 82-83). Several members of the management team also complained to Hancock that they were uncomfortable being asked by Gibson to criticize other members of the management team. (Tab C, Hancock Aff. ¶ 19). Hancock discussed the document she found in the printer and Gibson's plan for this meeting with Gibson, telling her that some of the managers were concerned about being asked to give criticism about the other managers. Hancock felt that Gibson raised her voice during the meeting while telling Hancock she was not doing a good job of supervising her staff. (Tab C, Hancock Aff. ¶ 20). Gibson admits that she may have told Hancock that some of the problems with the management team were her fault and that Hancock left the building after their discussion. (Tab A, Gibson Dep. pp. 85-86).

Heckert became the Regional Training Manager in August 2009 and Gibson began reporting to her. Around October 2009, Heckert and Hancock met with Gibson in person to discuss performance expectations. In the meeting, Heckert requested that Gibson email her daily with a list of her assignments/tasks for the day to make sure employees were being trained properly. (Tab A, Gibson Dep. pp. 52-55). During that same meeting, Heckert requested that Gibson revise the training binders because she believed they were being kept improperly. (Tab A, Gibson Dep. p. 55).

In May 2010, Heckert issued a reprimand to Gibson for not being effectively prepared to implement training on a new RAD. The

document Heckert issued to Gibson included steps Gibson was to take
to improve her performance. Gibson signed the reprimand and
acknowledged receipt. (Tab A, Gibson Dep. pp. 108-12; Tab A, Gibson
Dep. Ex. 2). Also in 2010, Hancock and Heckert again met with
Gibson. Gibson is not sure when the meeting took place but believes
it was in October 2010. During that meeting, issues with
communication and attitude were discussed. Gibson believes the
meeting was called because Heckert felt Gibson did not care for her
and believed Gibson did not want to communicate with her. (Tab A,
Gibson Dep. pp. 46, 99-102, 106-07).

Heckert placed Gibson on a corrective action plan on December
1, 2010. Heckert and Hancock met with Gibson in person in Hancock's
office to deliver the plan. The plan outlined eight areas of
significant deficiency in Gibson's job performance that required
immediate improvement. These issues included: not properly listing
important dates on the Source Plasma Training Check Lists; not
timely completing assessments and audits; not properly referring to
assessments and audits in training materials; having expired
documentation in the training binders; requesting staff to complete
training documentation required of the training coordinator, and
inconsistent inclusion of documentation in the training binders.
This action plan was delivered by Heckert. (Tab A, Gibson Dep. pp.
113, 116; Tab A, Gibson Dep. Ex. 3).

On January 22, 2011, Gibson began a leave of absence for a

work related injury.  She was out from January 22, 2011 through March 8, 2011. (Tab A, Gibson Dep. pp. 107, 137).

In February 2011, while Gibson was out on leave, Tina Dillard became the new Regional Quality Assurance Manager and Gibson's supervisor. (Tab C, Hancock Aff. ¶ 25; Tab D, Dillard Aff. ¶ 2) Before taking on the new role, Dillard was the training coordinator at another BBC facility in Hammond, Indiana. (Tab A, Gibson Dep. p. 140-141; Tab D, Dillard Aff. ¶ 1).  On March 24, 2011, as part of her transition into her new role, the Corporate Quality Assurance Department requested that Dillard audit various areas of the Gary center's training program and whether Gibson was meeting the performance expectations set out in the December 1, 2010 corrective action plan issued to Gibson. (Tab D, Dillard Aff. ¶ 5).

Dillard's audit of the training materials at the Gary center consisted of auditing the training binders for approximately 30 employees, checking the training calendar to ensure all trainings had been performed when directed by corporate, reviewing the Regulatory Affairs Directive ("RAD") binder to ensure it was complete and that training on all RADs had been performed when indicated by corporate and were documented correctly, auditing all standard operating procedures to ensure they were current, and checking all forms in all files for completeness-including signatures and dates. In addition, she determined the status of the items in Gibson's corrective action plan. (Tab D, Dillard Aff. ¶¶

6, 8, 9). It took Dillard approximately one week to complete her audit of the training materials at the Gary center. (Tab D, Dillard Aff. ¶ 10). Based on her audit of the Gary center training materials, Dillard noted multiple errors in addition to the training binders being out of compliance. These errors included but were not limited to pages missing from the RAD binders, documentation indicating trainings on RADs were completed well after the completion date given by corporate, missing training documentation, incomplete training documents such as documents missing dates and signatures, and some employees were found to be missing trainings altogether that were required by corporate. (Tab D, Dillard Aff. ¶ 11, 12). Dillard considered the errors she found in the training materials at the Gary center to be serious and substantial. (Tab D, Dillard Aff. ¶ 13). Dillard reported the findings of her audit to Hancock. (Tab D, Dillard Aff. ¶ 14). Based on the information from Dillard's audit, Hancock decided to terminate Gibson's employment. (Tab C, Hancock Aff. ¶ 28). Hancock and Dillard met with Gibson on April 7, 2011 and Hancock informed Gibson that her employment was being terminated for poor job performance. (Tab A, Gibson Dep. pp. 137-38). Gibson signed and received a notice of termination during the April 7 termination meeting. (Tab A, Gibson Dep. pp. 142-143; Tab A, Gibson Dep. Exs. 5-6).

Neferititi Beacham began working for BBC in October 2008 as a

phlebotomist. She also performed the duties of a plasma processor, as needed. (Tab B, Beacham Dep. pp. 11, 13-14, 19-20). Phlebotomists are responsible for the plasmapheresis process, from preparing the donor through collection, then disconnecting the plasma unit and delivering the plasma for sampling. (Tab C, Hancock Aff. ¶ 31). In the phlebotomist role, Beacham's duties included performing venipuncture (puncturing the donor's vein to collect plasma), monitoring for donor over bleeds (which occurs when a phlebotomist takes more plasma from a donor than is allowed based on the donor's body mass), monitoring for donor infiltrations, following all standard operating procedures ("SOP"), and monitoring donors for adverse reactions. (Tab B, Beacham Dep. pp. 14, 24). Plasma processors are responsible for collecting plasma samples and verifying that the samples and plasma units are transferred to the proper storage. (Tab C, Hancock Aff. ¶ 32). Beacham's duties when acting as a plasma processor included separating good sample bottles from quarantine bottles and ensuring that the FDA and SOP requirements were followed. (Tab B, Beacham Dep. pp. 16-17) Beacham received training on standard operating procedures at the time of hire and was re-certified approximately every six months. (Tab B, Beacham Dep. p. 16). Beacham reported to the manager on duty depending on the shift. (Tab B, Beacham Dep. p. 19).

Standard Operating Procedures ("SOPs") are to be followed at all times, with no exceptions. (Tab B, Beacham Dep. p. 23)

Employees are trained on the SOPs and the SOPs are housed in the donor processing areas for employee's reference. (Tab A, Gibson Dep. p. 25). In September 2010, Beacham reported slipping on something left on the floor at work and was out of work for three weeks. (Tab B, Beacham Dep. p. 236).

SOP 450 covers the proper procedure to use with venipuncture site preparation. Beacham was trained on this SOP and it was also available to employees for review in the donor center. (Tab B, Beacham Dep. pp. 99-100; Tab B, Beacham Dep. Ex. 8). SOP 450 requires the employee to scrub the Iodine Gel Swabstick directly over the venipuncture site for at least 30 seconds before allowing the site to dry and performing the venipuncture:

6.1.3 Obtain a 10% Povidone-Iodine Gel Swabstick.

6.1.4 Hold the gel swabstick at an angle and begin scrubbing vigorously in a circular motion over a one inch area, directly over the venipuncture site. Continue this scrubbing for at least 30 seconds.

6.1.5 After scrubbing for at least 30 seconds, and using the same applicator, begin at the venipuncture site and move gradually outward in concentric circles to form a total prepped area measuring at least three inches in diameter.

6.1.6 Discard the used swab.

6.1.7 Allow prepped site to dry for at least 30 seconds.

(Tab B, Beacham Dep. pp. 99, 100; Tab B, Beacham Dep. Ex. 8, emphasis in original).

On February 10 and 11, 2011, BBC customer Baxter Healthcare Corporation ("Baxter") performed an audit at BBC's Gary center.

(Tab B, Beacham Dep. p. 103) Two Baxter representatives performed the audit: Robin Kubota, Manger/Plasma Quality Assessment Gorup, and Rita Nerby, Manager-Supplier Quality/Plasma Quality Assessment Group. (Tab C, Hancock Aff. ¶¶ 33, 34).

Carlos Peña, at the time BBC's Assistant Manager of the Gary center, accompanied the Baxter auditors during the audit. (Tab E, Peña Aff. ¶ 6). The Baxter auditors determined which BBC employees they would observe during the audit. (Tab E, Peña Aff. ¶ 7). One BBC employee the Baxter auditors observed during their audit was Beacham. At the time they observed Beacham she was attempting to perform venipuncture site preparation on a donor. (Tab E, Peña Aff. ¶ 8, 9). Peña was accompanying the Baxter auditor who observed Beacham performing venipuncture site preparation. On Beacham's first attempt to prepare the site, the auditor informed Peña that Beacham failed to scrub a one inch diameter site for a full 30 seconds. Peña, in turn, told Beacham to try again and reminded her she needed to scrub the site for a full 30 seconds. Beacham failed to scrub the site for a full 30 seconds on three additional attempts. Beacham scrubbed the site for the full 30 seconds on her fifth attempt after Peña walked Beacham through the proper scrub process. (Tab E, Peña Aff. ¶ 12). After Beacham failed to scrub the site several times for the full 30 seconds, the Baxter auditor asked Peña if Beacham was a new employee, if she had been trained on proper venipuncture site preparation, and if she should know

better. Peña responded that Beacham had received venipuncture site preparation training and had been employed long enough to know better. (Tab E, Peña Aff. ¶ 13). At the end of their audit, the Baxter auditors met with the Gary center management, including Hancock and Peña, to provide the preliminary results of their audit. The Baxter auditors reported that Baxter considered Beacham's failure to follow standard operating procedures for venipuncture site preparation to be a major violation of Baxter's standards and the regulatory requirements BBC was being audited against. The Baxter auditors also informed Gary center management that BBC would have 30 days to correct any quality standard not being met and would be required to report the corrective actions BBC took to Baxter. (Tab C, Hancock Aff. ¶¶ 37-39).

The Baxter auditors prepared a preliminary assessment report and gave that to Hancock at the conclusion of their audit. The preliminary assessment report stated the following as to Baxter's findings regarding Beacham's failure to meet standards for venipuncture site preparation:

> Multiple instances in which employee NDB [Nefertiti D. Beacham] did not use the proper technique when performing venipuncture site preparation on donor with bleed number GP160406. During the first four preparation attempts employee did not scrub a once inch diameter for 30 seconds. The scrub times were 10 seconds, 15 seconds, 15 seconds, and 20 seconds. Note: After receiving instruction from assistant manager employee correctly performed site preparation on fifth attempt.

(Tab C, Hancock Aff. ¶ 38; Tab B, Beacham Dep. pp. 100, 101 and Tab

B, Beacham Dep. Ex. 9).

Based on Baxter's audit results regarding Beacham, Hancock made the decision to terminate her employment. (Tab C, Hancock Aff. ¶¶ 41, 42). Dianna Benavente, Assistant Manager, met with Beacham on February 17, 2011 to inform Beacham that her employment was terminated. During the meeting, Benavente provided Beacham with a Notice of Termination. The Notice stated that "Termination is due to: Failure to perform proper sterilization/scrub on donor during an audit." (Tab B, Beacham Dep. pp. 101-02, 120-30; Tab B, Beacham Dep. Ex. 13). According to Beacham, Benavente told Beacham that Baxter requested that BBC terminate Beacham's employment. (Tab B, Beacham Dep. pp. 101-02).

Hancock believed that terminating Beacham was the appropriate response to the repeated violation of the SOP during the audit. (Tab C, Hancock Aff. ¶ 42). Benavente allowed Beacham to contest the termination decision in writing on the back of the Notice of Termination. In her written response contesting the termination, Beacham did not claim that the decision was discriminatory. Beacham did state, "I made a mistake on an audit" and that "I performed a scrub wrong 3 times and got fired." (Tab B, Beacham Dep. pp. 129-31; Tab B, Beacham Dep. Ex. 14). Beacham now claims that she did not make a mistake and that she did each scrub for a full 30 seconds. (Tab B, Beacham Dep. p. 105). But Beacham also recognizes as she testified during her deposition that "the customer is always

right" and that BBC could not dispute Baxter's findings: "The auditor felt that I did a scrub violation wrong. She felt that it wasn't 30 seconds. I felt that it was 30 seconds, but by she being the auditor and us buying plasma, by BBC buying plasma for them [Baxter], I cannot argue with her." (Tab B, Beacham Dep. pp. 105, 136-37).

As evidence of discrimination, Beacham points to four other employees she believes committed more than one scrub violation but were not terminated: Kesha Askew, Francis Bonner, Tina Garmon, and Jennifer Orszulak. (Tab B, Beacham Dep. pp. 165-67, 203). Askew, Bonner, and Garmon are African American. Beacham testified that Askew and Bonner could make mistakes but were not terminated because they were "favored" by Dianna Benavente and the other managers. Beacham believes she was not favored by Benavente because she told Benavente that Benavente was not doing her job and told another manager, Dianna Ruiz, that she spent too much time on Facebook. Beacham provided no explanation for why she believed Garmon was treated more favorably. (Tab B, Beacham Dep. pp. 164-67, 203). Orszulak is white and was employed by BBC as a phlebotomist. She committed a scrub violation during an FDA inspection of BBC's Gary center on April 25, 2011. Orszulak was not immediately terminated for this scrub violation. (Tab B, Beacham Dep. pp. 186-89). After her termination, Beacham launched a complaint against BBC's Gary center with the FDA. Beacham does not remember the day

she complained to the FDA, but she requested a copy of the FDA's report through the Freedom of Information Act and the report indicates Beacham made her complaint on April 11, 2011. (Tab B, Beacham Dep. pp. 185-89; Tab B, Beacham Dep. Ex. 18). In response to Beacham's complaint, the FDA inspected BBC's Gary center on Spril 25 through 28, 2011. (Tab B, Beacham Dep. Ex. 18 at 2).

On April 25, the FDA inspector observed an employee scrub the venipuncture site on a donor for 25 seconds instead of the required 30 seconds. This employee was Orszulak. BBC took corrective action while the FDA was still on site for the inspection. Specifically, BBC retrained Orszulak on proper site preparation by reviewing SOP 450, required Orszulak to perform 25 arm scrubs under direct supervision, completed an Errors/Accident Report for the incident, and quarantined the plasma unit. (Tab B, Beacham Dep. p. 189; Tab B, Beacham Dep. Ex. 18 at 2, 8).

On April 26, 2011, Gibson emailed Dunkerly a one line email with the subject line: PARTY and the full content read "YOU GUYS HAVING A PARTY TODAY." Dunkerly shared the email with Hancock. (Tab C, Hancock Aff. ¶ 45, Ex. 5 to Hancock Aff., Gibson Email). BBC did not terminate Orszulak based on the April 25 scrub violation because Orszulak was a relatively new employee (hired August 11, 2010), she failed to scrub long enough only once, not several times in a row, and the FDA did not infer that BBC needed to terminate her for the violation. (Tab C, Hancock Aff. ¶ 48). On May 4, 2011,

BBC terminated Orszulak's employment after she was observed performing four short scrubs in a row – one 15 seconds, one 21 seconds, one 25 seconds, and one 25 seconds. (Tab C, Hancock Aff. ¶ 49; Ex. 6 to Hancock Aff., Orszulack Termination Notice).

On April 29, 2011, Hancock discovered that her personnel file was missing from file cabinets in the administrative building at the Gary center. (Tab C, Hancock Aff. ¶ 50). Given the confidential personnel and financial information contained in the file, Hancock notified the Gary police department who completed a police report. (Tab C, Hancock Aff. ¶ 51; Exhibit 7 to Hancock Aff., Police Report). The police officers asked Hancock for the names of any employees terminated within the last few months who had access to the office. BBC gave the names of those employees to the police. The names of employees who had been terminated BBC gave to the police included Beacham and Gibson and the police listed their names in the police report. (Tab C, Hancock Aff. ¶ 52; Ex. 7 to Hancock Aff., Police Report).


Title VII - Race Discrimination Claims

Plaintiffs each allege that she was discriminated against on the basis of her race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-5. There are two ways a race discrimination claim can be proven. There is a direct and an indirect method. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d

935, 938 (7th Cir. 2003). In an abundance of caution, this Court will examine whether Plaintiffs can proceed under either method.

Direct Method

Under the direct method a plaintiff must "show either through direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose." *Id*. at 938-939. Direct evidence consists of either an outright admission by the decision maker that the challenged action was undertaken because of the [plaintiff's race] or a convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action. *Dass v. Chicago Bd. of Educ*., 675 F.3d 1060, 1071 (7th Cir. 2012)(citations and quotations omitted). Gill does not cite to any admissions of discrimination, and relies, instead, on circumstantial evidence form which she alleges a trier of fact could reasonably infer that LaPorte discriminated against her because of her race.

To create a convincing mosaic, a plaintiff can rely on "three different types of circumstantial evidence of intentional discrimination: (1) suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence that similarly situated employees outside the protected class

received systematically better treatment; and (3) evidence that the plaintiff was qualified for the job in question but was passed over in favor of a person outside the protected class and that the employer's stated reason was a pretext for discrimination." *Id.* (citations and footnotes omitted). Ultimately, the circumstantial evidence a plaintiff presents "must point directly to a discriminatory reason for the employer's action" and be "directly related to the employment decision." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003); *Venturelli v. ARC Cmty. Services, Inc.*, 350 F.3d 592, 602 (7th Cir. 2003). Here, there is no evidence under any of the three categories. Simply put, there is no direct evidence of race discrimination.

### Indirect Method

When using the indirect method a plaintiff must first make a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To do this, the plaintiff must show that 1) he belongs to a protected class 2) he was meeting his employer's legitimate performance expectations 3) he suffered an adverse employment action and 4) other similarly situated employees who were not members of the protected class were treated more favorably. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007).

If the plaintiff is able to make out a prima facie case the

burden then shifts to the defendant to make a legitimate, nondiscriminatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. 792 at 802. If the defendant meets this burden then the plaintiff is afforded a chance to show that the defendant's nondiscriminatory reason is mere pretext for discrimination. *Id.* at 804. To show pretext the plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence." *Fane*, 480 F.3d 534 at 541. While the burden does shift between the plaintiff and the defendant, the ultimate burden of persuasion is always with the plaintiff. *Id.* at 538.

Neither Beacham nor Gibson can make out a prima facie case of discrimination because neither can show that she was meeting her employer's legitimate performance expectations. As training coordinator, Gibson had many responsibilities including training new employees on safety and good practices, maintaining compliance with OSHA regulations, retraining employees who were out of compliance, and training new employees on standard operating procedures. The undisputed facts show that Gibson failed in many of these duties. In fact, in December 2010, BBC issued a corrective action plan to Gibson that detailed her several areas of deficiency. When a new Regional Quality Assurance Manager took over responsibility of the Gary facility in March 2011, she

assessed Gibson's filed and progress of the corrective action plan. This week-long assessment noted all of Gibson's deficiencies in the documents and training materials. When Hancock learned of the deficiencies, she made the decision to terminate Gibson.

As to Beacham, one of BBC's customers, Baxter Healthcare Corporation, witnessed Beacham incorrectly perform a venipuncture site scrub four times during an audit. Beacham acknowledged that she was well aware of and had ready access to the standard operating procedure that instructed employees exactly how they must properly prepare a venipuncture site.

Because Gibson and Beacham failed to meet their employer's legitimate performance expectations, they have failed to create a prima facie case of discrimination. Nevertheless, even if Gibson or Beacham could establish a prima facie case, their claims would still fail because they cannot show that the reasons given for their terminations were a lie to cover up any racial animus.

As a result, BBC is entitled to summary judgment on Plaintiffs' race discrimination claims.


Defamation

As part of the Gary Police Department's investigation of a missing personnel file at BBC, officers asked Hancock for the names of any employees terminated within the last few months who had access to the office. BBC gave the names of those employees to

police, including Beacham and Gibson, who the police then listed in the police report. Gibson and Beacham argue that BBC's statements to police constitute actionable defamation.

Under Indiana law, the elements of a defamation claim are: "(1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages." *Trail v. Boys and Girls Club of Northwest Indiana*, 811 N.E.2d 830, 841 (Ind. Ct. App. 2004). "A statement is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* (quoting *Gatto v. St. Richard Sch., Inc.*, 774 N.E.2d 914, 923 (Ind. Ct. App. 2002)).

The basis of Plaintiffs' claim are statements in the police report in Case No. 11-30996. The report states that a file containing information regarding Jane Hancock was taken from her office and identifies three former employees who had access to Hancock's office. There are no statements identified in the report that are false. Nor is there any facts suggesting that BBC acted with malice in reporting those facts to the Gary Police. For both of those reasons, there is no claim for defamation.


Retaliation

Beacham and Gibson also allege that BBC terminated them because they filed workers' compensation claims. As BBC points out,

Indiana law recognizes a narrow exception to the state's general rule of at-will employment. This public policy exception, sometimes referred to as a *Frampton* case, recognizes a cause of action for termination in retaliation for filing a workers' compensation claim. *Stivers v. Stevens,* 581 N.E.2d 1253 (Ind. Ct. App. 1991) (citing *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973)). To survive a motion for summary judgment on a *Frampton* case, plaintiffs must produce direct or indirect evidence supporting the necessary inference of causation between filing a worker's compensation claim and termination. *Purdy v. Wright Tree Serv.*, 835 N.E.2d 209, 212-216 (Ind. Ct. App. 2005) (affirming summary judgment for the employer on retaliatory discharge claim where employer terminated employee in accordance with its policies).

Beacham and Gibson have put forth no facts or evidence to support their retaliation claims. All that is on the record are the dates they each reported their respective work injury and the dates their employment terminated. BBC terminated Beacham approximately 6 months after reporting her work related injury. BBC terminated Gibson approximately 2 ½ months after reporting her work related injury. But "timing evidence is rarely sufficient in and of itself to create a jury issue on causation." *Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 787 (7th Cir. Ind. 2005).

Moreover, BBC's stated reasons for each of their terminations

are strong and credible. BBC terminated Beacham in response to a customer audit during which Beacham repeatedly failed to properly prepare a venipuncture site. BBC terminated Gibson based on well documented, long-standing performance deficiencies, which culminated in the issuance of a corrective action plan before she reported a workplace injury. *See Hudson*, 412 F.3d at 787 (affirming summary judgment for employer on workers' compensation retaliation claim where employee was fired a few days after inquiring about his workers' compensation rights because the employer's stated reason for the termination were strong and credible). Accordingly, Plaintiffs' *Frampton* claims fail.

### Intentional Infliction of Emotional Distress

Intentional infliction of emotional distress under Indiana law is the intent to harm someone emotionally and requires that the defendant: (1) engage in extreme and outrageous conduct; (2) which intentionally or recklessly; (3) causes; (4) severe emotional distress to another. *Curry v. Whitaker*, 943 N.E.2d 354, 361 (Ind. Ct. App. 2011) (affirming summary judgment for defendants against intentional infliction claim). The requirements to prove this tort are rigorous and it is found only when the conduct "exceeds all bounds typically tolerated by a decent society and causes mental distress of a very serious kind." *Curry*, 943 N.E.2d at 361.

As BBC points out, to support her claim, Gibson alleges in her

complaint only that manager Diana Ruiz "would go behind [Gibson's] back" to undermine her authority and that when she sought clarification from other managers, they would "verbally attack" her in order to ridicule her in front of other members of the staff. (Complaint, Count IV, ¶ 13.B.1).

Gibson claims this caused her mental distress because her authority was undermined. Gibson does not allege that her mental distress was severe. (Complaint, Count IV, ¶ 13.C) Even if this behavior is taken as true, this is not the "atrocious" and "utterly intolerable" conduct required to maintain this tort action. *Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1262 (Ind. Ct. App. 2002) (reversing trial court's denial of employer's motion for summary judgment on intentional infliction claim because act of firing pursuant to a disciplinary policy is not extreme and outrageous conduct and the employer's actions in terminating employee could not be regarded as atrocious or utterly intolerable). Not only are the allegations deficient, but there is no evidence in the record to support an IIED claim.

Gibson also alleges that the behavior of these managers (of which she never complained to local or corporate management) was the cause of her inability to effectively perform her duties, which was ultimately the reason for her termination. To the extent Gibson alleges that her termination was part of the conduct which caused her intentional infliction claim, that does nothing to help her

claim. Gibson was terminated when her performance did not improve despite repeated instances of coaching and being placed on a corrective action plan. Terminating an employee for good reason does not constitute extreme and outrageous conduct. *Powdertech*, 776 N.E.2d at 1262. Thus, the IIED claim fails.

CONCLUSION

For the reasons set forth above, the motion for summary judgment is **GRANTED**. Because no claims remain pending, this case is **DISMISSED** and the Clerk is **ORDERED** to enter judgment in favor of Defendant and close this case.

DATED:  July 7, 2014                    /s/RUDY LOZANO, Judge
                                        **United States District Court**